United States District Court
Southern District of Texas
**ENTERED**
October 26, 2020
David J. Bradley, Clerk

# IN THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS GALVESTON DIVISION

No. 3:19-CV-0192

RYAN ANTONIO MATTHEWS, PETITIONER,

**v.**

BOBBY LUMPKIN, RESPONDENT.

## MEMORANDUM OPINION AND ORDER

JEFFREY VINCENT BROWN, UNITED STATES DISTRICT JUDGE.

The petitioner, Ryan Antonio Matthews, seeks a writ of habeas corpus under 28 U.S.C. § 2254 to challenge the conviction and sentence he received in state court in Brazoria County (Dkts. 1, 2). The respondent, Bobby Lumpkin,[1] has answered with a motion for summary judgment (Dkt. 15) arguing that Matthews is not entitled to relief. Matthews has filed a reply (Dkt. 28). After considering all the pleadings, the state-court records, and the applicable law, the court will grant the respondent's motion, deny the petition, and dismiss this action for the reasons explained below.

---

[1]     The previously named respondent in this action was Lorie Davis. On August 11, 2020, Bobby Lumpkin succeeded Lorie Davis as Director of the Correctional Institutions Division. Under Rule 25(d)(1) of the Federal Rules of Civil Procedure, Bobby Lumpkin "is automatically substituted as a party."

## BACKGROUND

### I.   The Crime

The victim, a sixteen-year-old Pearland high-school student, took a home pregnancy test on February 26th, 2014, that rendered positive results. A doctor's visit confirmed that she was twelve weeks pregnant. The victim was excited a week later to find that she carried twins. She decided to transfer to an alternative school in Pearland.

On March 21, the last school day before the victim's transfer, family members came home to find the house in disarray. There was no sign of forced entry. The victim's father eventually found her dead, lying in a pool of blood. She had died from a combination of manual strangulation and stab wounds to her neck and head.

The police investigation quickly turned to the victim's sexual partner, sixteen-year-old Ryan Antonio Matthews. Matthews had been in a casual sexual relationship with the victim for several months but still maintained relationships with other girls. Matthews did not share the victim's enthusiasm about the pregnancy; he saw it as an impediment to his dreams of college education and sports stardom. Matthews had repeatedly and persistently urged the victim to abort the pregnancy, either through a medical provider or through self-harm.

Matthews was the last person known to have been with the victim. A friend had dropped Matthews off at the victim's home only a few hours before her family

found her dead.  Testing confirmed that Matthews had sexual relations with the victim soon before her death.  When questioned by police, Matthews repeatedly lied about various material facts.  The police arrested Matthews for the murder of the victim and their two unborn children.

## II.   The Juvenile-Court Proceedings

In Texas, a juvenile court has original jurisdiction over any child under seventeen years of age.  *See* Tex. Fam. Code §§ 51.02(2), 51.04.  Matthews was only a few weeks shy of his seventeenth birthday when the offense occurred.[2]  The State of Texas initially filed charges in the County Court at Law No. 2 and Probate Court of Brazoria County, sitting as a juvenile court.  *In the matter of Ryan Antonio Matthews*, No. JV 19869H.  On May 23, 2014, the Brazoria County prosecuting attorney filed a petition for a discretionary transfer to criminal court alleging that a child, Matthews, had committed two counts of capital murder.

Under Texas law, "[t]he juvenile court may waive its exclusive original jurisdiction and transfer a child to the appropriate district court or criminal district court for criminal proceedings" if certain conditions are met.  Tex. Fam. Code § 54.02.  As part of the transfer proceedings, Dr. Michael Fuller, a forensic psychiatrist with the University of Texas Medical Branch, examined Matthews on June 5, 2014.  Dr. Fuller was one of four witnesses who testified in a July 8, 2014, juvenile-court hearing on the transfer petition.  Dr. Fuller explained that Matthews

---

[2]      Matthews was born on April 5, 1997.

did not have a history of major psychiatric illness, was not intellectually disabled, and exhibited no impairment in his memory, judgment, reasoning, or insight.  Dr. Fuller testified that Matthews understood the charges against him and possessed a rational ability to engage in a reasoned choice of legal strategies and options—including the ability to enter a plea and testify at trial.

The juvenile court also received evidence of Matthews's prior offenses, (assault and credit-card abuse), his poor school disciplinary history, and his participation in an altercation while in custody.  A police officer testified about Matthews's dishonesty during the investigation, his threats to other students who asked about the pregnancy, and his flight risk.

After considering the parties' testimony, evidence, and argument, the juvenile court waived its jurisdiction and transferred the case to the state district court.  The juvenile court entered an order outlining the reasons for certifying Matthews for prosecution as an adult: (1) he exhibited sufficient sophistication and maturity to stand trial in adult court; (2) he possessed sufficient sophistication and maturity to aid an attorney in his defense; and (3) the nature of the offense and Matthews's criminal history weighed in factor of protecting the public through adult certification, especially given the paucity of evidence showing the hope for rehabilitation through juvenile procedures.  The juvenile court's order also made case-specific findings of fact based on the nature of the offense, Matthews's threats to others, and his age which had nearly removed him from juvenile court's original

4

jurisdiction.

## III.   Trial

On July 24, 2014, Matthews was indicted for two counts of capital murder in Cause 73841, filed in the 239th District Court for Brazoria County.  Trial began on April 14, 2015.  As set forth by the state intermediate appellate court, the trial evidence established the following facts:

> Sixteen-year-old Amy[3] was pregnant with twin boys when she was strangled and stabbed to death at her home in Pearland, Texas. [Matthews], about three weeks shy of his seventeenth birthday at the time of Amy's murder,[4] was the father of Amy's unborn children. Both attended the same Pearland high school and had met in class. They were not dating but were involved in a sexual relationship. When Amy discovered she was pregnant, [Matthews] was very upset. He encouraged her to take actions to induce a miscarriage, such as punching herself in the stomach several times a day. He also encouraged Amy to have an abortion. [Matthews] was very concerned about the impact having a child would have on his life; he even told Amy that he had considered killing himself because of the pregnancy. When Amy confessed to her parents she was pregnant, they quickly took her to a doctor. An ultrasound revealed that Amy was pregnant with twins; Amy thought this was good news. [Matthews], on the other hand, was extremely upset to discover that Amy was having twins. When Amy told [Matthews] that abortion was no longer an option, [Matthews] was angry.
>
> On the day of Amy's murder, [Matthews], Amy, and a friend of theirs skipped an afternoon class, and the friend drove them to Amy's home so that [Matthews] and Amy could have sex. The friend had done this on several occasions in the past. The friend dropped them off, and [Matthews] and Amy entered through the back door of Amy's home, as was their normal practice. The two went upstairs and had sex, although [Matthews] claimed in an interview with detectives he did not "finish" because he was concerned he could hurt the babies.

---

[3]   We replace the minor complainant's true name with a pseudonym.

[4]   Amy was killed on March 21, 2014; [Matthews] turned seventeen on April 5, 2014.

[Matthews] also claimed in that interview that he and Amy talked about their future and both became emotional. He stated he left the house alone through the back door, while Amy was upstairs crying.

[Matthews's] friend picked him up in front of the house about an hour later. His friend noted that [Matthews] appeared "normal," but did not come out of the front door of the home accompanied by Amy as had happened in the past. [Matthews] was also wearing different clothing than he had been wearing earlier in the day. About forty-five minutes after [Matthews] left Amy's home, Amy's younger brother arrived. Amy's brother called her name and didn't hear a response. He went upstairs and saw several items broken and lying on the floor in his parents' room. Thinking the house had been burglarized, he ran to a neighbor's house and called his mother.

Amy's mother tried to contact Amy, but Amy didn't respond. Amy's mother drove home from work immediately and entered the house through the garage. She saw the master bedroom in disarray, left the house and returned to the garage, and called 911. She told the 911 operator that her home had been burglarized, and she couldn't find her daughter. Amy's mother also called her husband at work. Amy's father drove home from work and arrived while Amy's mother was still there. He went inside the house to look around; during his search, he found Amy's body in her bedroom lying in a pool of blood.

Amy's father ran back downstairs to his wife, took her outside, and told her that their daughter was dead. The two began to cry and remained outside the house until police arrived. When Pearland Police Department officers arrived on the scene, Amy's father told them that their daughter had been murdered. Pearland police officers entered the home and found Amy's body. Amy's father told responding officers that [Matthews] had gotten her pregnant and that he believed [Matthews] had killed her. Officers determined that the home had been staged to appear as if it had been burglarized; Amy's parents found nothing missing.

Pearland Police Detectives Jennifer Page and Cecil Arnold interviewed [Matthews] later that evening around 10:00 p.m., after obtaining his address from the high school. At the time of this interview, the detectives had not had a chance to thoroughly review any of the evidence obtained from the crime scene, nor had any security videos from [Amy and Matthews's] high school or the guard

house at the entry to Amy's neighborhood been obtained. The initial interview occurred at the home of Mavani Thornhill, who was allowing [Matthews] to use her address so that [Matthews] could enroll in a particular Pearland high school. [Matthews's] parents maintained a home in another part of Pearland zoned for a different high school. When Thornhill discovered the detectives were looking for [Matthews], she contacted [Matthews's] parents and asked them to come to her home with [Matthews].

Detectives Page and Arnold initially spoke with [Matthews] alone in Thornhill's home, with the permission of [Matthews's] parents and [Matthews]. This interview lasted for about an hour until Detective Arnold determined that [Matthews] was not being honest with the detectives. For example, [Matthews] first said he last saw Amy the previous day before admitting that he had been with her earlier that day. He also said that he had some type of feature on his cell phone that automatically deleted texts before admitting that he deleted the texts himself when his phone's storage got full. [Matthews] accurately described the clothes Amy was wearing when her body was found. He also admitted having sex with Amy on the day of her murder, but claimed he stopped because he was afraid he would hurt the babies. [Matthews] told the detectives he left Amy alone, upstairs, crying, and that he left the home through the back door. He told the detectives that he was supportive of Amy and never angry with her about the pregnancy. Detective Arnold told [Matthews] that the detectives were hearing rumors from other students that [Matthews] and Amy had gotten into an argument, but [Matthews] denied that had happened. [Matthews] insisted that when he left, Amy was unharmed. When pressed, [Matthews] had no idea who would have harmed Amy.

Detective Arnold stopped the interview and asked [Matthews's] parents and Thornhill to come into the room to encourage [Matthews] to be honest and forthcoming. [Matthews's] parents and Thornhill did exactly that, encouraging him to tell the detectives what had happened and warning him that the truth would come out through the evidence at the scene. [Matthews] continued to insist that he had not harmed Amy. During the second exchange, the detectives collected some of [Matthews's] clothing, including [Matthews's] athletic shorts, shirt, underwear, and athletic shoes, as well as a DNA swab for subsequent testing. [Matthews] told Detective Arnold that none of Amy's blood would be on any of the clothing he wore to Amy's house. During the interviews, he also agreed to turn over his cell phone to the detectives

7

and provided them with the pass code to access it. He told the detectives that he texted Amy around 4:00 p.m., but that she didn't respond, so he texted her again about an hour later. Subsequent analysis showed, however, that [Matthews] sent Amy three quick text messages at around 3:25 p.m., with no responses from her.

[Matthews] and his parents agreed to allow the detectives to accompany them to [Matthews's] home, where [Matthews] turned over additional items, including another shirt, socks, blue jeans (that had been washed and bleached), and the backpack [Matthews] said he had taken to school on the day of the murder. However, some of the clothing and the [backpack Matthews] provided were different from what Detective Page later saw [Matthews] wearing in a school security video recorded on the day of the murder. A multicolored backpack, tan shoes, and a shirt similar to what is seen on the video were later recovered during execution of a search warrant.

According to Amy's autopsy, she died from a combination of manual strangulation and stabbing. The unborn twins suffocated and died in the womb when Amy died. Fingernail clippings were taken from Amy during the autopsy; [Matthews's] DNA was recovered from these clippings. The blue jeans, athletic shoes, tan shoes, and the multicolored backpack all tested positive for Amy's DNA. DNA testing also confirmed that [Matthews] had sex with Amy on the day of her murder and that he was the father of the twin boys.

[Matthews] testified during his trial. He acknowledged that he encouraged Amy to have an abortion and that he looked for ways that a miscarriage might be induced. He admitted that it bothered him for Amy to discuss the pregnancy, that he had a short temper, and that he was upset when other students tried to speak with him about the pregnancy. He explained that Amy was bleeding while they were having sex, which may have caused her blood to be found on his belongings. He also acknowledged that he had lied to investigators during his interview because he did not want his parents to know that he had skipped school to have sex with Amy. He testified that when he left on the day Amy was murdered, she was collecting clothes to wash, not crying on the bed as he had told Detectives Arnold and Page. He further stated that he had lied to investigators about the clothes he was wearing on the day of the murder.

*Matthews v. State*, 513 S.W.3d 45, 51-53 (Tex. App-Houston [14th Dist.] 2016, pet.

ref'd), *cert. denied*, ____ U.S. ____, 138 S. Ct. 279 (2017) (footnotes [renumbered] in original).

A jury found Matthews guilty on April 23, 2015. The trial court automatically sentenced Matthews to life in prison pursuant to § 12.31 of the Texas Penal Code, which governs punishment for capital felonies (Dkt. 19-40, at 7-8). Under the Texas statutory punishment scheme that applies to juvenile offenders convicted of a capital offense, Matthews will not be eligible for parole until he has served forty years. *See* Tex. Penal Code § 12.31(a)(1); Tex. Gov't Code § 508.145(b).

## IV.    Direct Appeal

On direct appeal to the Fourteenth Court of Appeals, Matthews challenged the process that resulted in his certification as an adult by the juvenile court, the constitutionality of the Texas punishment and parole scheme for juvenile capital offenders, and the sufficiency of the evidence to support his conviction (Dkt. 16-6, at 12-13). The state court of appeals affirmed Matthews's conviction and sentence. *Matthews*, 513 S.W.3d at 51-53. The Texas Court of Criminal Appeals refused Matthews's petition for discretionary review on May 17, 2017. The United States Supreme Court denied Matthews's petition for a writ of certiorari. *Matthews v. Texas*, ____ U.S. ____, 138 S. Ct. 279 (2017).

## V.    State Habeas Action

Matthews filed an application for a state writ of habeas corpus under Article 11.07 of the Texas Code of Criminal Procedure, arguing that he was denied effective

assistance of counsel and due process during both his juvenile-certification proceeding and his criminal trial (Dkt. 19-40, at 10-35). After considering an affidavit from one of Matthews's trial attorneys (Dkt. 19-40, at 59-61), the state habeas corpus court—which had also presided over the criminal trial—entered findings of fact and conclusions of law, recommending that relief be denied (Dkt. 19-40, at 210-16). The Texas Court of Criminal Appeals agreed and denied relief without a written order based on the trial court's findings. *See Ex parte Matthews*, No. WR-89,712-01 (Tex. Crim. App. June 12, 2019) (Dkt. 18-21, at 1).

## VI. Federal Habeas Petition

Through counsel, Matthews filed a federal petition for a writ of habeas corpus challenging his state-court conviction and sentence under 28 U.S.C. § 2254 (Dkt. 1). Matthews has filed a memorandum of law that expands on his arguments for federal habeas relief (Dkt. 7). Matthews raises the following grounds for relief:

1. Trial counsel provided ineffective assistance during the juvenile-certification hearing by not objecting to inadmissible and harmful documentary evidence (Dkt. 1, at 6-7; Dkt. 7, at 36-40).

2. Trial counsel provided ineffective assistance during the juvenile-certification hearing by not objecting to inadmissible and harmful testimony (Dkt. 1, at 6; Dkt. 7, at 42-46).

3. Trial counsel provided ineffective assistance during the juvenile-certification hearing by not investigating and presenting available evidence relating to the juvenile-certification factors (Dkt. 1, at 7; Dkt. 7, at 50-56).

4. Trial counsel provided ineffective assistance during the juvenile-certification hearing by not objecting to the court's

reliance on prior testimony and probable-cause findings (Dkt. 1, at 7; Dkt. 7, at 66-72).

5.   Matthews was denied due process during the juvenile-certification hearing when the state presented false and misleading evidence about rehabilitative programs (Dkt. 1, at 11; Dkt. 7, at 82-88).

6.   Matthews was denied due process during the juvenile-certification hearing when the State emphasized positive presumptive blood-test results without mentioning negative results obtained during confirmatory testing (Dkt. 1, at 11; Dkt. 7, at 88-91).

7.   Matthews was denied due process during the juvenile-certification hearing when the State presented testimony from Dr. Fuller about the juvenile-certification factors (Dkt. 1, at 11; Dkt. 7, at 91-94).

8.   Matthews was denied due process during the criminal trial when the state presented false and misleading evidence regarding presumptive blood-test results when subsequent testing and confirmatory testing yielded negative results, showing no blood was found, or was never conducted (Dkt. 1, at 11; Dkt. 7, at 103-09).

9.   Trial counsel provided effective assistance of counsel during the criminal trial by failing to challenge the admission of presumptive blood-test results where subsequent testing and confirmatory testing showed no blood was found (Dkt. 1, at 11; Dkt. 7, at 116).

10.   Trial counsel provided effective assistance of counsel during the criminal trial when his attorney failed to object to the admission of numerous bad acts for which the State failed to give the requisite notice (Dkt. 1, at 11; Dkt. 7, at 124-30).

11.   The juvenile court abused its discretion when it transferred the charges against him to criminal court because it failed to state specific factual findings underlying the transfer, misapplied the "sophistication and maturity" factor that it was required to consider under § 54.02(f) of the Texas Family Code, and

transferred the case without sufficient evidence to support the stated reasons (Dkt. 1, at 11; Dkt. 7, at 138-51).

12. The Texas punishment and parole scheme for juvenile capital offenders is facially unconstitutional under the Eighth Amendment because the court could not consider mitigating factors and there is no meaningful opportunity for release (Dkt. 1, at 7; Dkt. 7, at 156-67).

13. The Texas punishment and parole scheme for juvenile capital offenders is facially unconstitutional as applied to him because his life sentence was imposed without regard to mitigating circumstances and affords no meaningful opportunity for release (Dkt. 1, at 7; Dkt. 7, at 156-67).[5]

The respondent has filed a motion for summary judgment (Dkt. 15) arguing that Matthews is not entitled to relief under the governing habeas corpus standard of review. Matthews has responded to the summary-judgment motion (Dkt. 28). This case is ripe for judicial review.

## STANDARD OF REVIEW

The federal writ of habeas corpus exists to free a person who "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). While the modern writ "plays a vital role in protecting constitutional rights," *Slack v. McDaniel*, 529 U.S. 473, 483 (2000), "[a] criminal trial is the main event at which a defendant's rights are to be determined, and the Great Writ is an extraordinary remedy that should not be employed to relitigate state trials." *McFarland v. Scott*, 512 U.S. 849, 859 (1994) (quotation omitted). Honoring

---

[5] Matthews numbers his habeas claims differently in his habeas petition and his memorandum of law. The court follows the numbering in Matthews's memorandum of law.

principles of comity and federalism that respect the finality of state judgments, the Supreme Court has "found it necessary to impose significant limits on the discretion of federal courts to grant habeas relief." *Calderon v. Thompson*, 523 U.S. 538, 554 (1998); *see also Danforth v. Minnesota*, 552 U.S. 264, 278 (2008) (observing that courts have "adjust[ed] the scope of the writ in accordance with equitable and prudential considerations"). In addition, Congress also spoke to the deference federal courts must show state courts in habeas proceedings when it passed the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See* 28 U.S.C. § 2241 et seq.

Before a state prisoner can seek federal habeas corpus review he must exhaust remedies by presenting all claims in state court. *See* 28 U.S.C. § 2254(b); *O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999). Matthews raised his claims either on direct appeal or state habeas corpus review.[6] If an inmate has presented his federal constitutional claims to the state courts in a procedurally proper manner, and the state courts have adjudicated their merits, AEDPA provides for a deferential federal review. "[T]ime and again," the Supreme Court "has instructed

---

[6]     In an abundance of caution, Matthews's memorandum advanced a proposed fourteenth ground for relief based on *Brady v. Maryland* in anticipation that a review of the prosecution's file may reveal "*Brady* evidence that was not disclosed" (Dkt. 1, at 20; Dkt. 7, at 178-79). In his response to the summary-judgment motion, Matthews states he will abandon his *Brady* claim if the respondent argues that it is unexhausted (Dkt. 28 at 28). In a supplement to the summary-judgment motion, the respondent argues that Matthews has not exhausted a *Brady* claim in state court (Dkt. 25). Because Matthews failed to exhaust a *Brady* claim in state court, provides no meaningful discussion of his putative *Brady* claim, and has effectually abandoned the claim, the court will not address that issue further.

13

that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *White v. Wheeler*, 577 U.S. 73, 77 (2015) (quotation omitted).  Under AEDPA's rigorous requirements, an inmate may secure relief only after showing that the state court's rejection of his claim was either "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1),(2).

AEDPA review exists only to "guard against extreme malfunctions in the state criminal justice systems . . . ." *Woods v. Donald*, 575 U.S. 312, 315 (2015) (quotation omitted).  To merit relief under AEDPA, a petitioner may not merely show legal error in the state court's decision.  *See White v. Woodall*, 572 U.S. 415, 420 (2014) (stating being "merely wrong" or in "clear error" will not suffice federal relief under AEDPA).  "[F]ocus[ing] on what a state court knew and did," *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011), AEDPA requires inmates  to "'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woodall*, 572 U.S. at 420 (quoting *Richter*, 562 U.S. at 103); *Berghuis v. Thompkins*, 560 U.S. 370, 380 (2010); *Williams v. Taylor*, 529 U.S. 362, 413 (2000). "If this standard is difficult

14

to meet, that is because it was meant to be." *Richter*, 562 U.S. at 102.

A petitioner challenging the factual basis for a state decision must show that it was an "unreasonable determination of the facts in light of the evidence . . . ." 28 U.S.C. § 2254(d)(2); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). A federal habeas court must also presume the underlying factual determinations of the state court to be correct, unless the inmate "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Miller-El*, 537 U.S. at 341; *Young v. Dretke*, 356 F.3d 616, 629 (5th Cir. 2004) ("As a federal habeas court, we are bound by the state habeas court's factual findings, both implicit and explicit.").

This case comes before the court on the respondent's motion for summary judgment. In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir. 2000). However, AEDPA modifies summary-judgment principles in the habeas context, and Rule 56 "applies only to the extent that it does not conflict with the habeas rules." *Smith v.*

15

*Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004); *see Torres v. Thaler*, 395 F. App'x 101, 106 n.17 (5th Cir. 2010). "Therefore, § 2254(e)(1)—which mandates that findings of fact made by a state court are presumed to be correct—overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party." *Smith*, 311 F.3d at 668.

## DISCUSSION

### I.    Claims Arising from the Juvenile-Certification Process

Most of Matthews's claims arise from the juvenile process that resulted in his trial as an adult.  On July 8, 2014, the juvenile court entered an order waiving jurisdiction and transferring his case to the district court.  In doing so, the juvenile court considered and applied the provisions of Section 54.02 of the Texas Family Code.  In claims one through seven and eleven through thirteen, Matthews challenges the constitutional underpinnings of Texas's juvenile-certification scheme and the process it afforded him.  A proper understanding of the juvenile-certification process frames Matthews's grounds for relief.

Matthews committed his crime as a juvenile.  Texas law recognizes that juvenile offenders differ from adult criminal defendants and thus warrant additional protections.  *See In re Hall*, 286 S.W.3d 925, 927 (Tex. 2009).  A Texas juvenile court has exclusive original jurisdiction over a person committing criminal acts before age seventeen.  *See* Tex. Fam. Code §§ 51.02(2), 51.04.  Section 54.02

of the Texas Family Code governs the transfer of juvenile proceedings to district court. "Section 54.02 is not a punishment provision but a transfer provision." *Matter of A.K.*, 2020 WL 1646899, at *7 (Tex. App.-Fort Worth, 2020). Under that section, the juvenile court does not examine "the juvenile's innocence or guilt but merely evaluates whether he should be tried as a juvenile or an adult in subsequent proceedings." *J.L.G. v. State*, 1996 WL 682496, at *2 (Tex. App.-Houston 1996). The question in a juvenile-certification proceeding is whether trial as an adult is in the best interests of both the juvenile and society. *See Hidalgo v. State*, 983 S.W.2d 746, 754 (Tex. Crim. App. 1999) (describing how the statute weighs a juvenile offender's "potential danger to the public" against his "amenability to treatment"). Given that specific focus, Texas courts refer to juvenile-certification proceedings as a "nonadversarial preliminary hearing." *L.M.C. v. State*, 861 S.W.2d 541, 542 (Tex. App.-Houston [14th Dist.] 1993, n.w.h.); *see also Hidalgo v. State*, 983 S.W.2d 746, 755-56 (Tex. Crim. App. 1999) ("Judicial transfer permits the interests of both society and the juvenile to weigh against each other in a neutral setting.").

Statutory mandates govern these "'critically important'" transfer proceedings. *Moon v. State*, 451 S.W.3d 28, 36 (Tex. Crim. App. 2014) (quoting *Kent v. United States*, 383 U.S. 541, 560-62 (1966)). Under Texas law, a juvenile court may waive exclusive jurisdiction over a minor and transfer him to a district for criminal prosecution only if certain conditions are met:

> (1) the child is alleged to have committed a felony, (2) the child meets one of two age requirements, and (3) after a full investigation and hearing, the juvenile court determines that probable cause exists to believe the juvenile committed the alleged offense and the community's welfare requires criminal proceedings because of the serious nature of the offense or the child's background.

*Pipkin v. State*, 329 S.W.3d 65, 69 (Tex. App.-Houston [14 Dist.], 2010) (citing Tex. Fam. Code § 54.02(a)).

The State bears the burden "to produce evidence to inform the juvenile court's discretion as to whether waiving its otherwise-exclusive jurisdiction is appropriate in the particular case." *Moon v. State,* 451 S.W.3d 28, 40 (Tex. Crim. App. 2014). Before transferring the child, a juvenile court must order and obtain a full and complete diagnostic study, social evaluation, and investigation of the child, his circumstances, and the circumstances surrounding the alleged offense. *See* Tex. Fam. Code § 54.02. Based on that review, the juvenile court must evaluate: (1) the sophistication and maturity of the child; (2) the record and previous history of the child; and (3) the prospects of adequate protection of the public and the likelihood of the rehabilitation of the child by use of procedures, services, and facilities currently available to the juvenile court. Tex. Fam. Code §§ 54.02(a), (f). With those factors, the State must "persuade the juvenile court, by a preponderance of the evidence, that the welfare of the community requires transfer of jurisdiction for criminal proceedings, either because of the seriousness of the offense or the background of the child (or both)." *Moon v. State,* 451 S.W.3d 28, 40-41 (Tex. Crim. App. 2014). Transfer of a juvenile for prosecution as an adult

18

"should be regarded as the exception, not the rule." *Id.* at 36.

With that understanding, the court considers Matthews's specific challenges to the juvenile-certification process and its application in his case. First, Matthews raises two constitutional challenges relating to the role of mitigating circumstances in the certification process (claims twelve and thirteen). Second, Matthews contends that the juvenile court abused its discretion in transferring his case to the district court (claim eleven). Third, Matthews alleges that his attorney in the certification proceeding provided deficient performance by failing to (a) raise hearsay objections (claims one and two); (b) engage in an adequate investigation into the certification factors (claim three); and (c) raise other objections (claim four). Finally, Matthews argues that the State presented false evidence in the certification hearing (claims five through seven). Matthews exhausted each of these claims in state court. Matthews must show that the state court's denial of each claim was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1).

### A.   The Punishment and Parole Scheme for Juvenile Offenders (Claims 12-13)

Certification of Matthews as an adult came with "tremendous consequences" including being "subject to the retributive punishment of the criminal justice system instead of the rehabilitative goal of the juvenile justice system." *Hidalgo v. State*, 983 S.W.2d 746, 755 (Tex. Crim. App. 1999). Once the trial court certified Matthews as an adult, he faced two charges of capital murder. Because Matthews

had committed the murders as a minor, the Constitution made him ineligible for a death sentence. *See Roper v. Simmons*, 543 U.S. 551, 594 (2005). However, section 12.31(a) of the Texas Penal Code provides for a mandatory punishment of life *with the possibility of parole* for a person guilty of committing a capital felony as a juvenile. Tex. Penal Code Ann. § 12.31(a)(1).

In ground twelve of his petition, Matthews contends that the Texas punishment and parole scheme for juvenile offenders convicted of capital offenses is facially unconstitutional under the Eighth Amendment. Matthews complains that the statutory scheme precludes "an opportunity to have a sentencing authority consider mitigating factors and provides no meaningful opportunity for release" (Dkt. 1, at 19-20). In ground thirteen, Matthews contends that the statutory scheme is unconstitutional as applied to him because his mandatory sentence of life was imposed "without regard to mitigating circumstances" and without any "meaningful opportunity for release based on rehabilitation" (*Id*. at 20).

Matthews bases both claims on *Miller v. Alabama*, 567 U.S. 460 (2012). In *Miller*, the Supreme Court held that "the Eighth Amendment forbids a sentencing scheme that *mandates* life in prison w*ithout possibility of parole* for juvenile offenders." 567 U.S. at 479 (emphasis added) (citing *Graham v. Florida*, 560 U.S. 48, 75 (2010) ("A State is not required to guarantee eventual freedom," but must provide "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation")). To comply with the Eighth Amendment, "a judge

20

or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Miller*, 567 U.S. at 489. Absent a finding that the offender's crimes make him "the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility," a sentence of life without parole is an "unconstitutional penalty." *Montgomery v. Louisiana*, ____ U.S. ____, 136 S. Ct. 718, 734 (2016).

Since *Miller* was decided the Texas Court of Criminal Appeals has rejected claims that Texas Penal Code §12.31(a) is facially unconstitutional. In *Lewis v. State*, the Texas Court of Criminal Appeals distinguished between the circumstances in *Miller* and those allowing for mandatory life sentences providing for parole:

> *Miller* does not forbid mandatory sentencing schemes. The mandatory nature of a sentencing scheme is not the aspect that precludes rehabilitation; rather, the sentencing scheme in *Miller* was unconstitutional because it denied juveniles convicted of murder all possibility of parole, leaving them no opportunity or incentive for rehabilitation. Life in prison with the possibility of parole leaves a route for juvenile offenders to prove that they have changed while also assessing a punishment that the Legislature has deemed appropriate in light of the fact that the juvenile took someone's life under specified circumstances. . . . *Miller* does not entitle all juvenile offenders to individualized sentencing. It requires an individualized hearing only when a juvenile can be sentenced to life without the possibility of parole.

428 S.W.3d 860, 863 (Tex. Crim. App. 2014). The Texas Court of Criminal Appeals has succinctly held that "[j]uvenile offenders sentenced to life with the possibility of parole are not entitled to individualized sentencing under the Eighth

Amendment." *Turner v. State*, 443 S.W.3d 128, 129 (Tex. Crim. App. 2014*); see also United States v. Sparks*, 941 F.3d 748, 754 (5th Cir. 2019) ("[S]entences of life with the possibility of parole or early release do not implicate *Miller*.").

Matthews attempts to minimize the distinction between the Texas statute and *Miller* because a life-sentenced capital Texas inmate must serve his entire sentence without becoming eligible for good time credits or other means of early release. *See* Tex. Gov't Code § 508.145(b) ("An inmate serving a life sentence under Section 12.31(a)(1), Penal Code, for a capital felony is not eligible for release on parole until the actual calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years."). Matthews argues that the extended period before parole eligibility falls within the *Miller* Court's criticism of when a sentencing scheme for juvenile offenders offers no "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Miller*, 540 U.S. at 75.

*Miller*, however, only requires States to afford juvenile offenders facing life imprisonment a *potential* opportunity, through parole or by other means, for release. "A State is not required to guarantee eventual freedom to a juvenile offender" and is not required "to release that offender during his natural life." *Graham v. Florida*, 560 U.S. 48, 75 (2010) (discussing the Eight Amendment implications of a statute addressing a non-homicide crime); *see also Virginia v. LeBlanc*, ____ U.S. ____, 137 S. Ct. 1726, 1729 (2017) (finding that the possibility of

geriatric release rendered a juvenile sentencing statute constitutional).  Matthews, in essence, asks for an extension of *Miller* to hold that a State's sentencing scheme cannot require a mandatory term of years before parole eligibility of capitally sentenced juvenile offenders.  The nonretroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), would bar Matthew's proposed extension of *Miller* on federal habeas review.

The state court of appeals overruled both claims twelve and thirteen on direct appeal because "the court of last resort in criminal matters in this State [the Texas Court of Criminal Appeals] has unequivocally spoken on both of his constitutional issues and rejected them."  *Matthews*, 513 S.W.3d at 62.  The Texas court correctly held that *Miller* does not apply because Matthews's sentence allowed for his parole.  Matthews has not shown that the state court's decision was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).  Matthews, therefore, has not shown any entitlement to habeas relief on claims twelve and thirteen.

## B.    Abuse of Discretion by the Certification Court (Claim 11)

The eleventh claim in Matthews's federal petition challenges the process by which the juvenile court waived its jurisdiction.  Matthews claims that the juvenile court erred when it "1) failed to state the specific factual findings of the court undergirding its reasons for transfer; 2) misapplied the sophistication and maturity prong; and 3) [certified him as a an adult] where the evidence admitted

at the transfer hearing was insufficient to support the court's stated reasons for transfer." (Dkt. 28, at 42-43). Based on those alleged errors, Matthews complains that the juvenile court abused its decision in waiving jurisdiction.

For the most part, Matthews asks this court to decide whether the juvenile court correctly applied state law in transferring his case to district court. Whether or not the state courts correctly applied Texas law is not a matter for federal habeas concern. Courts have long held that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991); *see Wilson v. Corcoran*, 562 U.S. 1, 5 (2010) ("federal habeas corpus relief does not lie for errors of state law") (internal quotation marks and citation omitted). The court looks to the application of federal constitutional principles, not state law, in assessing the procedure Matthews received before transfer to state district court.

The Constitution protects juveniles facing the possibility of trial as an adult. In *Kent v. United States*, the Supreme Court characterized such transfer proceedings as "critically important," and held that any juvenile-court waiver proceedings must at least "measure up to the essentials of due process and fair treatment." 383 U.S. 541, 560-62 (1966). The Supreme Court has not, however, specified "the exact nature of the constitutional requirements of due process at a juvenile transfer hearing." *Spytma v. Howes*, 313 F.3d 363, 367-68 (6th Cir. 2002). The *Kent* Court did not require that a waiver hearing "conform with all of

24

the requirements of a criminal trial or even of the usual administrative hearing." *Kent*, 383 U.S. at 562. Instead, as a baseline, a juvenile has "a due process and Sixth Amendment right to a hearing, a statement of the reasons for the juvenile judge's decision to transfer the case, and assistance of counsel." *Gonzales v. Tafoya*, 515 F.3d 1097, 1115 (10th Cir. 2008) (citing *Kent*, 383 U.S. at 557); *see also Atkins v. Holloway*, 792 F.3d 654, 663 (6th Cir. 2015). In the end, a federal court's concern "is whether [the habeas] petitioner received due process as required by *Kent*, not whether the state court meticulously complied with" the precise dictates of state law. *Spytma*, 313 F.3d at 369.

Matthews challenges the sufficiency of the state court's written order, its application of statutory factors,[7] and its assessment of the underlying evidence. Here, the juvenile court held a hearing to consider the waiver of jurisdiction. Counsel represented Matthews at the hearing. The State called four witnesses: two juvenile probation officers, an appointed psychiatrist, and a Pearland Police Department detective. While Matthews's attorney did not call any witnesses, nothing in the record suggests that anything impaired his ability to represent his

---

[7]     Matthews contends that the juvenile court misapplied the sophistication and maturity prong of Tex. Fam. Code § 54.02(a) when considering transfer (Dkt. 7, at 143). The appellate court admitted that "it may be that the juvenile court misapplied this factor by focusing on whether [Matthews] was sufficiently sophisticated and mature to aid in his defense." *Matthews*, 513 S.W.3d at 57. Nevertheless, the appellate court found that "the juvenile court's other factual bases for transfer are supported by legally and factually sufficient evidence." *Id.* Matthews has not provided any law suggesting that possible error in the consideration of that factor alone would warrant reversal. Again, Texas' interpretation of its own statutory language is not a matter for federal consideration.

client.

By arguing that the juvenile court "failed to state the factual underpinnings of its conclusions and grounds for transfer in its transfer order," Matthews misstates the record (Dkt. 7, at 141).  Under Texas law, a juvenile court waiving jurisdiction must "state specifically" its reasons for certification.  *Moon*, 451 S.W.3d at 40; *see also* Tex. Fam. Code § 54.02(h).  The Court of Criminal Appeals has explained that the statute requires a juvenile court to "take pains to 'show its work,' as it were, by spreading its deliberative process on the record, thereby providing a surefooted and definite basis from which an appellate court can determine that its decision was in fact appropriately guided by the statutory criteria, principled, and reasonable[.]"  *Moon*, 451 S.W.3d at 49.  The state appellate court "disagree[d]" with Matthews's argument "that the transfer order did not state the factual underpinnings of the court's conclusions and grounds for transfer."  *Matthews*, 513 S.W.3d at 56.  The juvenile court entered a written order "not[ing] that it was considering the factors mandated by section 54.02(f) of the Juvenile Justice Code" and "then made the following findings and determinations:

- [Matthews] was alleged to have committed capital murder under Texas Penal Code section 19.03;
- [Matthews] was seventeen years old at the time of the hearing;
- [Matthews] was sixteen years old at the time of the offense;
- [Matthews's] father resides in Brazoria County and his mother resides in Harris County;
- No adjudication hearing had been conducted;
- The parties were properly notified of the hearing;
- Prior to the transfer hearing, a "complete diagnostic study" of [Matthews] had been completed by Dr. Michael Fuller;

- There was probable cause to believe that [Matthews]committed the felony offense of capital murder against a person;
- [Matthews] was of sufficient sophistication and maturity to be treated as an adult because he could aid an attorney in his defense;
- [Matthews's] records and previous history made the prospects of adequate protection for the public and the likelihood of reasonable rehabilitation by the use of the Juvenile Justice Court doubtful;
- Because of the extreme and severe nature of the offenses alleged, the prospects of adequate protection for the public and the likelihood of reasonable rehabilitation through the Juvenile Justice system were doubtful; and
- After considering all of the testimony, diagnostic study, social evaluation, and full investigation of [Matthews] and the circumstances of the offenses alleged, and because of the seriousness of the alleged offenses and background of appellant, the welfare of the community required criminal proceedings.

*Matthews*, 513 S.W.3d at 56-57.

Given the protections afforded to him in juvenile court, Matthews has not shown federal constitutional error in the process or decision that resulted in his transfer to district court. In sum, Matthews has not shown that the state court's rejection of these claims was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## C. Claims of False Evidence (Claims 5-8)

Matthews raises three claims of specific due-process errors involving the presentation of false evidence in his waiver hearing. In *Giglio v. United States*, 405 U.S. 150, 153 (1972), the Supreme Court held that "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with

27

rudimentary demands of justice." *Id.* at 153 (quotation omitted). "To establish a due process violation based on the State's knowing use of false or misleading evidence, [petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false." *Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (citing *Giglio*, 405 U.S. at 153–54).

Matthews raised his false-evidence claims on state habeas review. The state habeas court found that Matthews had "fail[ed] to show that the State presented either false or misleading evidence during the juvenile certification hearing through" the testimony of (1) "Martha Mosshart regarding the availability and effectiveness of rehabilitative programs at the Texas Juvenile Justice Department, specifically with regard to the Capital and Serious Violent Offender Treatment program"; (2) "Lt. Cecil Arnold regarding positive presumptive blood[-]test results on the [Matthews's] shoes, pants and backpack"; and (3) "Dr. Michael Fuller, specifically, with regard to whether his findings were inconsistent with the [Matthews's] prior medical history." State Habeas Record at 212. On federal habeas review, the court presumes that those factual findings are correct unless Matthews shows otherwise by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). If he can show that the state court was incorrect in its underlying findings, Matthews still bears the burden under AEDPA of showing that the state habeas court's decision based on those facts was contrary to, or an unreasonable application of, federal law. 28 U.S.C. § 2254(d)(1). Specifically, the state habeas

28

court concluded that Matthews "fail[ed] to show that any of the State's evidence . . . was in fact false or otherwise created a false impression . . . during . . . the juvenile[-]certification proceeding . . . ."  State Habeas Record at 214.

### 1.    Juvenile Probation Officer

First, Matthews contends that "[t]he State presented false and misleading evidence through Martha Mosshart, whose testimony distorted and concealed the 'procedures, services, and facilities currently available to the juvenile court'" (Dkt. 7, at 84) (quoting Tex. Fam. Code § 54.02(f)(4)).  Mosshart was a probation officer who had been a former caseworker for the Texas Youth Commission (now known as the Texas Department for Juvenile Justice (TDJJ)).  Matthews concedes that the State called her "to discuss a program about which she admittedly had indirect and incomplete knowledge" (Dkt. 7, at 84).  Mosshart explained that, because of his crime, TDJJ would likely place Matthews in the Giddings Unit.  J.R.R. Vol. 3 at 17.[8]  Mosshart testified about a program she described as the "violent offender treatment program."  Mosshart, however, did not have personal knowledge of the programs offered by the Giddings Unit.  Instead, Mosshart based her testimony on a conversation she had with someone at the Giddings Unit.

The court of appeals summarized Mosshart's testimony as follows:

She testified that the TDJJ has had extremely few capital offenders. In fact, from 2007 to 2012, only twelve capital offenders have been committed to the TDJJ out of a total of 7,496 commitments. All of those capital offenders were given determinant sentences; none were

---

[8]    The court will follow Matthews's citation to the Juvenile Reporter's Record as "J.R.R."

simply committed to TDJJ. She stated that these juveniles generally are transferred to the Texas Department of Criminal Justice (TDCJ) once they reach a certain age—usually proceedings to transfer them begin within a month of their nineteenth birthdays.

Mosshart explained that the TDJJ has a program for violent offenders, but that there is generally a wait list to get into the program. She agreed that because of the nature of the alleged conduct, [Matthews] would likely get priority status for the program, however. Mosshart suggested that a commitment to TDJJ alone would not be appropriate for the type of offense that [Matthews] was alleged to have committed—i.e., that [Matthews] should be given a determinate sentence even should the juvenile court not waive jurisdiction. She noted there was only a short window of time to get [Matthews] into this treatment program, given his age and likely impending transfer to TDCJ when he turned nineteen. This evidence supports the juvenile court's conclusion concerning the likelihood of [Matthews's] reasonable rehabilitation through the Juvenile Justice System.

*Matthews*, 513 S.W.3d at 59-61.

Matthews has not proven that the State knowingly presented false evidence to the juvenile court. Nothing in the record indicates that the State engaged in intentional malfeasance. Instead, Matthews assumes that the State should have known that the information it put before jurors was false. In doing so, Matthews points out various concerns with Mosshart's testimony, many of which derive from comparisons between her testimony and TDJJ reports. On state habeas review, however, Matthews described the core of his concerns as follows:

Probation Officer Martha Mosshart's testimony was false and misleading because her testimony: 1) described the treatment program merely as a "violent offender treatment program," rather than recognizing that the program is called the Capital and Serious Violent Offender Treatment Program and was especially designed for juvenile capital offenders; 2) repeatedly emphasized that Matthews was unlikely to get into the program based on available space and population.

State Habeas Record at 174.

Matthews first complains that Mosshart gave incorrect testimony about the name of the program at the Giddings Unit.  Although Mosshart described the program as the "violent offender treatment program," its official name is the "Capital and Serious Violent Offender Treatment Program."   (Dkt. 7 at 84). Mosshart's testimony about the name of the program is an incomplete shortening of its title.  Given the whole of her testimony, Mosshart did not indicate that all capital offenders would be wholly ineligible for its services.

To the extent Matthews complains that Mosshart emphasized that space and availability would limit his participation in the program, he misreads her testimony.  The State framed her testimony in the context of whether she could guarantee participation in the program—something that even the statistics Matthews provided on habeas review could not do.  Throughout her testimony Mosshart emphasized that Matthews's age and the seriousness of his offense would greatly influence his custody and access to programs.

Matthews's arguments have little to do with the key issue before the juvenile court.  For example, Matthews says that "[c]ontrary to the prosecutor's misleading questions and Mosshart's answers, the program does accept teenagers who are 17 years old, as Matthews was at the time of the hearing" (Dkt. 7, at 86).  But the decision the juvenile court faced did not concern Matthews's eligibility for treatment at that precise moment.  At the time of the waiver hearing held on June

31

4, 2014, Matthews was seven months shy of his eighteenth birthday.  By the time his case came to trial on April 14, 2015, Matthews was already over the age of eighteen.  Matthews's age was a concern for the juvenile court to consider because the State would likely seek to transfer his custody to the Texas Department of Criminal Justice soon after any juvenile-court conviction.  J.R.R. Vol. 3 at 20-21. As the juvenile court considered his age, it would also consider his eligibility for rehabilitative programs.

Matthews now argues that TDJJ records indicate that the programs are more widely available than Mosshart's testimony suggested.  However, Matthews does not differentiate the data in the same manner as provided by Mosshart's testimony.  Matthews describes participation, and ultimate success levels, of "those youth demonstrating need into the program" (Dkt. 7, at 64), but does not provide details on the participation and success rate of juveniles who, like Matthews, faced capital-murder charges (and more particularly involving three victims).

Considering the whole of Mosshart's testimony, Matthews has not shown that the prosecution should have known that she testified falsely, much less that it was material as understood by Supreme Court precedent.  Ultimately, considering Matthews's false-evidence claim under AEDPA's deferential standard, he has not shown that the state habeas court's decision was contrary to, or an unreasonable application of, federal law.  *See* 28 U.S.C. § 2254(d)(1).  Habeas relief is not available on this claim.

2.      Presumptive Blood-Test Results

The juvenile court understood its obligation to decide whether "probable cause [existed] to believe that [Matthews] committed the offenses alleged in the State's motion[.]"  J.R.R. Vol. 3 at 9.  In an effort to show probable cause, the prosecution adduced testimony concerning blood traces found on clothing Matthews allegedly wore when he committed the offense.  Matthews argues that "[t]he State presented false and misleading evidence regarding presumptive blood-test results at the juvenile certification hearing."  (Dkt. 37, at 88).

The State called Cecil Arnold, a detective with Pearland Police Department, to testify about the police investigation.  Detective Arnold explained that testing presumptively identified blood on the blue jeans, backpack, and shoes Matthews allegedly wore during the murder.  J.R.R. Vol. 3 at 55-56.  Matthews argues that "Detective Arnold never told the juvenile court that when these items were subjected to confirmatory testing that the confirmatory test results were negative with respect to each of these items."  (Dkt. 7, at 88-89).

Matthews concedes that the information was not inaccurate—test results presumptively indicated the presence of blood.  Matthews, however, contends that the testimony was false or misleading because it was incomplete.  The State submitted the test results into evidence as an exhibit during the hearing, and the report indicated that the conclusive testing was negative for blood.  Matthews acknowledges that "[t]hose negative results immediately followed the presumptive

33

results on the report entered into evidence, but was never made a point by the State." (Dkt. 7, at 89). A petitioner may predicate a false-evidence claim on technically correct, but still misleading, testimony. *Blankenship v. Estelle*, 545 F.2d 510, 513 (5th Cir. 1977) (stating that a court "will not tolerate prosecutorial participation in technically correct, yet seriously misleading, testimony which serves to conceal the existence of a deal with material witnesses").

Here, the State introduced into evidence a report providing the juvenile court a complete understanding of the role blood analysis played in the police investigation. And the juvenile-court judge's role at that stage frames the concerns raised by the incomplete evidence. The State did not bear the burden of proving his guilt beyond a reasonable doubt in the waiver hearing. The State only needed to provide the juvenile court enough information to find probable cause. The presumptive blood test gave the State an opportunity to suggest that Matthews had suspiciously bleached his clothing after the murder as one facet of his efforts to conceal his involvement. The circumstances of the case as presented through additional testimony and evidence more-than-allowed for the juvenile-court judge to find probable cause independent of any testimony about presumptive blood results. Considering the whole of the information before the juvenile court, Matthews has not shown that the habeas court's resolution of this claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

### 3.    Forensic Psychiatric Testimony

Finally, Matthews contends that the State presented false evidence through the testimony of its expert witness, forensic psychiatrist Dr. Michael Fuller.  Dr. Fuller examined Matthews, at the order of the juvenile court, for purposes of evaluating whether Matthews should be transferred to adult criminal court.  The State presented Dr. Fuller's testimony to assist the juvenile court in deciding the various factors needed for the waiver inquiry, particularly whether Matthews was "sufficiently sophisticated and mature to be tried as an adult" and "sufficiently mature to aid [his] attorney in [his] defense."  J.R.R. Vol. 3 at 9.  As recounted by the appellate court,

> Dr. Michael Fuller examined [Matthews] for the certification hearing. Fuller testified that [Matthews] had no significant major psychiatric illness and that [Matthews] could think clearly and understand age-appropriate concepts. Fuller concluded that [Matthews] was intellectually and emotionally average for his age at the time of the testing—seventeen—and that [Matthews] understood the charges against him and what it meant to be certified as an adult. Fuller testified that it would be "appropriate and reasonable" for the juvenile court to certify [Matthews] as an adult.

*Matthews*, 513 S.W.3d at 59-61.

The State did not rely on Dr. Fuller's testimony alone to show that Matthews should be certified to stand trial as an adult.  The State verified some of his testimony through that of Victoria Gardzina, the deputy chief of probation for Brazoria County Juvenile Justice Department.  Gardzina testified that Matthews did not show any signs of mental instability or intellectual disability, had had

35

problems at school in the past but few recently, and had acted like an adult when dealing with problems while in custody.  J.R.R. Vol. 3 at 46-51.

On state habeas review, Matthews presented an affidavit from Dr. Stephen Thorne.  In his affidavit, Dr. Thorne outlined a litany of issues Dr. Fuller either under-investigated or wholly missed in his evaluation.  Matthews summarized the issues Dr. Thorne identified which allegedly render Dr. Fuller's testimony false and misleading:

> Matthews had long dealt with very elevated levels of depression; that his behavior included him crying and becoming very emotional; that he exhibited ADHD-type symptoms; impulsivity problems; problems completing tasks; problems maintaining focus; that he was in the bottom 0-25% range in social relationships and age-appropriateness; that Matthews was simple-minded, unsophisticated, and psychologically and emotionally immature with impulsive tendencies; that his IQ was in the 30th percentile for his age group; that for a significant period of his life he had mild to moderate periods of depression, sadness, and anxiety; that he worried a lot; that he was very self-conscious; that he was more stressed than not on a daily basis and had issues with substance abuse.

(Dkt. 7, at 93-94).

As an initial matter, Matthews has not shown that, even accepting Dr. Thorne's conclusions as true, the State had any inkling that its expert had not performed a full diagnostic review of Matthews.  Further, Matthews has not shown that the State should have known that his testimony was false.  The State verified much of Dr. Fuller's testimony about his current mental state through Gardzina, Matthews's probation officer.  Finally, Matthews has possibly shown that Dr. Fuller could have investigated more or that experts may come to different conclusions

about various psychological issues, but Matthews has not shown that the testimony adduced by the State was necessarily false. For those reasons, the court finds that Matthews has not shown that the state court's decision was unreasonable under AEDPA.

### D.    Ineffective Assistance of Counsel (Claims 1-4)

In claims one through four, Matthews contends that he was denied effective assistance of counsel during his juvenile-certification proceeding. Specifically, Matthews claims that trial counsel provided deficient representation by failing to (1) object to documentary evidence based on hearsay; (2) object to testimony based on hearsay; (3) investigate and present available evidence relating to the certification factors; and (4) object to the juvenile court's acceptance of prior testimony and probable cause findings from prior hearings. Matthews raised these claims on state habeas review.

A child in a Texas juvenile court has the right to effective representation at a transfer hearing. *See* Tex. Fam. Code § 51.10 (child entitled to representation by counsel at transfer hearing and may not waive right to counsel); *see also Kent*, 383 U.S. at 561-62 (finding that a juvenile offender has the right to effective assistance of counsel during juvenile-certification proceedings). On federal habeas review ineffective-assistance claims are analyzed under the clearly established legal standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail under the *Strickland* standard, a defendant must demonstrate both

constitutionally deficient performance by counsel and actual prejudice as a result of the alleged deficiency. *See id.* at 687. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that rendered the result unreliable." *Id.* Thus, the failure to demonstrate deficient performance or prejudice is fatal to an ineffective-assistance claim. *See id.* at 683; *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

To demonstrate deficient performance, "the defendant must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. This is a "highly deferential" inquiry in which "counsel is strongly presumed to have rendered adequate assistance" and that the challenged conduct was the product of reasoned trial strategy. *Id.* at 690. To overcome this presumption, a defendant must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment. *Id.* at 690.

A showing of mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Id.* at 691. To establish the requisite prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

38

Strategic decisions made by counsel during trial are entitled to substantial deference and are not subject to hindsight or judicial second-guessing on federal habeas review. *See Strickland*, 466 U.S. at 689 (emphasizing that "[j]udicial scrutiny of counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight"); *Lamb v. Johnson*, 179 F.3d 352, 358 (5th Cir. 1999) ("Informed strategic decisions of counsel are given a heavy measure of deference and should not be second guessed."); *Yohey v. Collins*, 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). A federal habeas corpus court may not find ineffective assistance of counsel merely because it disagrees with counsel's chosen trial strategy. *Crane v. Johnson*, 178 F.3d 309, 312 (5th Cir. 1999). "So long as counsel made an adequate investigation, any strategic decisions made as a result of that investigation fall within the wide range of objectively reasonable professional assistance." *Cotton v. Cockrell*, 343 F.3d 746, 752 (5th Cir. 2003) (citing *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (internal citations and quotation marks omitted)).

### 1. Hearsay Objections (Claims One and Two)

In his first and second claims, Matthews claims that trial counsel should have objected to inadmissible hearsay testimony during the certification hearing. Specifically, Matthews claims trial counsel should have objected to various items

of documentary evidence and testimony, such as that from Mosshart relaying information she received from the Giddings unit.   When the State moved to introduce the documentary evidence, trial counsel stated: "Well, I would object to hearsay; but I don't think hearsay applies to this proceeding."  J.R.R. Vol. 3 at 14.

Matthews's argument presupposes that counsel should have raised objections based on an unsettled area of Texas law.  On one hand, the respondent cites a body of law holding that a juvenile court may consider hearsay evidence in a waiver hearing.   "The juvenile court can determine probable cause in a nonadversary preliminary hearing through the use of hearsay besides written and oral testimony." *Grant v. State*, 313 S.W.3d 443 (Tex. App.-Waco 2010, no pet.) (citing *In re D.W.L.*, 828 S.W.2d 520, 524 (Tex. App.-Houston [14th Dist.] 1992, no pet.)). "It has been held that neither the Sixth Amendment nor the hearsay rule applies to a juvenile certification hearing."  *Milligan v. State*, 03-04-00531-CR, 2006 WL 357880, at *4 (Tex. App.-Austin Feb. 16, 2006, pet. ref'd) (citing *In re S.J.M.*, 922 S.W.2d 241, 242 (Tex. App.-Houston [14th Dist.] 1996, no writ); *Alford v. State*, 806 S.W.2d 581, 582 (Tex. App.-Dallas 1991), *aff'd*, 866 S.W.2d 619, 625 (Tex. Crim. App. 1993)).

On the other hand, Matthews refers to a state statute which provides: "Except as otherwise provided by this title, the Texas Rules of Evidence applicable to criminal cases and Articles 33.03 and 37.07 and Chapter 38, Code of Criminal Procedure, apply in a judicial proceeding under this title."  Tex. Fam. Code §

51.17(c).

One Texas appellate court has recently recognized that "no published Texas case has squarely addressed whether section 51.17(c) of the Juvenile Justice Code makes the Rules of Evidence and Chapter 38 of the Code of Criminal Procedure applicable to a transfer hearing." *Matter of H.Y.*, 512 S.W.3d 467, 474 (Tex. App.-Houston [1st Dist.], 2016). At least one court has cited that statute and ruled in an unpublished decision that "a juvenile court is not required to rule on the admissibility of evidence during a transfer hearing." *Id.* (citing *Navarro v. State*, Nos. 01-11-00139-CR & 01-11-00140-CR, 2012 WL 3776372, at *6 (Tex. App.-Houston [1st Dist.] Apr. 17, 2013, pet. ref'd) (mem. op., not designated for publication)). More often, Texas appellate courts avoid addressing this issue by relying on separate reasons for their decisions. *See, e.g., Matter of D.S.*, 2017 WL 3187021, at *5 (Tex. App.-Fort Worth 2017).

This federal court lacks authority to resolve the uncertainty in Texas law. However, on state habeas review trial counsel provided an affidavit responding to Matthews's argument that he should have objected on hearsay grounds. Trial counsel averred that he had consulted a treatise concerning the application of hearsay rules in certification hearings. State Habeas Record at 62-63. After doing so, he explained:

> While I do not have any independent memory of any specific comments that I made to the Court regarding the admissibility of evidence, I am confident that it was in discussions regarding the holdings the cases cited in [Texas Juvenile Law by Robert Dawson]. I

41

do understand that Texas Rules of Evidence 101(b) does not explicitly provide an exclusion to the rules of evidence for certification proceedings, however it appeared to me that case law has provided an exception. In fact, there are numerous cases that specifically state that the hearsay rule does not apply. My objections would have been without merit.

State Habeas Record at 59.

Trial counsel considered making a hearsay objection but, after reviewing the law, decided that precedent would not support his objection. Given the unsettled nature of Texas law, and Matthews's failure to show by a reasonable probability that the juvenile court would not have ordered the transfer had counsel objected, he has not demonstrated an entitlement to relief under AEDPA.

2.      The Certification Factors (Claim Three)

Matthews contends that trial counsel provided deficient representation in preparing for, and presenting evidence in, the waiver hearing. Matthews's argument follows three separate paths. First, Matthews contends that trial counsel should have interviewed people who knew him and called them to testify in his behalf. Matthew supports this argument with eleven affidavits from people who could testify about his lack of maturity and his potential for rehabilitation. Second, Matthews contends trial counsel should have retained an expert witness to counter the testimony of Dr. Fuller. In doing so, Matthews relies heavily on Dr. Thorne's affidavit which came to much different conclusions about his maturity and sophistication than those presented to the juvenile court. Finally, Matthews contends that correct information about the Capital and Serious Violent Offender

42

Treatment Program would have caused the juvenile court to retain jurisdiction. (Dkt. 7, at 51-52). Matthews devotes significant briefing to fleshing out the unpresented testimony and prognosticating how it may have influenced the juvenile court's decision.

The respondent relies on trial counsel's state habeas affidavit which provides an explanation of the investigation he conducted for the certification hearing (Dkt. 15, at 42). The bulk of respondent's argument, however, focuses on *Strickland*'s prejudice prong. The respondent especially highlights that a police officer testified that Matthews would be a flight risk and opined that Matthews's "'criminal history show[ed] escalating behavior from physical assault, thefts, credit[-]card abuse, all the way to where we are now, [and] the fact that Matthews was using a fake address so that he could attend a different school.'" *Matthews*, 513 S.W.3d at 59-60. The officer also testified that Matthews "was able to lie without hesitation regarding [his] whereabouts on the afternoon of the murder, as well as what he had been wearing." *See id.* In addition to that background, the respondent argues that Matthews's new evidence does not create a reasonable probability that the juvenile court would have retained jurisdiction:

> None of the evidence Matthews argues should have been presented could have mitigated the heinousness of Matthew's crime. Matthews did not commit capital murder by shooting a store clerk during the course of a robbery, or by shooting rival gang members, or even by taking a gun to school and shooting his classmates. As discussed in the Statement of Facts, supra., Matthews went to his paramour's house. He had sex with her. He then stabbed and strangled her because she was pregnant with his twins. He then tried to cover up the

> crime by lying to the police and hiding evidence. Matthews['s] actions spoke more to his maturity and sophistication level than anything counsel could have presented.  In fact, the Director is hard pressed to think of a crime more fitting for certification than this one. Matthews killed not only his teenage paramour, but also his children.

(Dkt. 15, at 41).

A court sitting on habeas review may deny a claim based on only one of the *Strickland* prongs.  *See Leal v. Dretke*, 428 F.3d 543, 548 (5th Cir. 2005) ("Failure to prove either prong will defeat an ineffective assistance claim.").  The state habeas court explicitly found that Matthews "fail[ed] to demonstrate any allegedly deficient performance prejudiced his case" and "no reasonable probability that, but for the conduct complained of, that the result of . . . the juvenile certification proceeding . . . would have been different."  State Habeas Record at 214.  Even considering the mitigating effect that Matthews's habeas evidence may have had, and the greater insight it may have given the juvenile court into his maturity and sophistication, the state habeas court was not unreasonable in considering how that evidence would have fit into the context of the evidence presented.  While Matthews now relies on lay testimony about his emotional state, the State called law-enforcement witnesses and juvenile-justice experts who provided detailed testimony about his sophistication and maturity.  The nature of the offense and Matthews's history weighed in heavily as the juvenile court deliberated whether adult certification would protect the public.  Despite his status as a juvenile, Matthews faced charges involving three murders, allegedly committed in a

particularly brutal fashion.  The juvenile court considered the fact that Matthews's age had nearly removed him from its original jurisdiction.  In the full context of what was presented at trial and that which was developed afterwards, the state habeas court's finding of no *Strickland* prejudice was not contrary to, or an unreasonable application of, federal law.

### 3.     Prior Hearings (Claim Four)

Finally, Matthews complains that trial counsel erred by letting the juvenile court "find probable cause and take notice of prior testimony and findings from hearings for which there was no record."  (Dkt. 7, at 66).  In the juvenile-waiver hearing, the State twice asked witnesses to discuss previous hearings for which no record existed.  J.R.R. Vol. 3 at 45, 51.  The juvenile-court judge had presided over the two prior detention hearings discussed by the State's witnesses.  That experience with Matthews's case allowed the juvenile court to take judicial notice of the prior hearings.  The respondent provides state law for the proposition that a "trial court is presumed to judicially know what has previously taken place in the case tried before it, the parties are not required to prove facts that a trial court judicially knows."  *In re J.J.C.*, 302 S.W.3d 436, 446 (Tex. App.-Houston [14th Dist.] 2009, pet. denied) (quotation and alteration omitted).  Matthews further fails to show any prejudice from the juvenile court recognizing what he had previously done in this case.  Thus, Matthews has not shown that the state habeas court was unreasonable in finding that he had not proven that "defense counsel

was ineffective during the juvenile certification hearing by failing to object to the court taking judicial notice of its prior findings and testimony regarding probable cause from prior detention hearings." State Habeas Record at 191.

### 4. Cumulative Error

Matthews alleges that the cumulative effect of the alleged errors by trial counsel merits habeas relief. The state habeas court held that, "[a]fter reviewing [Matthews's] claims of ineffective assistance, the Court concludes that they are without merit, either as individual claims or cumulatively, and that [Matthews] has failed to prove by a preponderance of the evidence his trial counsel performed deficiently either during the juvenile certification proceeding or ensuing trial." State Habeas Record at 214. As discussed with regard to each individual point above, Matthews has not shown that the state habeas court was unreasonable in adjudicating his individual *Strickland* arguments. Because Matthews has failed to prove that his counsel was ineffective in any respect, "there is nothing to cumulate." *Villaneuva v. Stephens*, 555 F. App'x 300, 308 (5th Cir. 2014).

Importantly, the court has reviewed the whole of Matthews's allegations and the entirety of the juvenile-certification process. While Matthews has shown that other attorneys may have approached the hearing differently, he has not shown a reasonable probability of a different result. Matthews had nearly aged out of the juvenile-court process when the court came to consider his transfer. The court had before it sufficient probable cause showing that Matthews had committed the

murders.  The court heard testimony about his maturity and sophistication from more than one source.  The State emphasized Matthews's poor behavioral history and, given his age and nature of the offense, near certainty that he would be soon transferred to TDCJ.  And the juvenile court had to consider that Matthews had committed a brutal crime which resulted in the loss of a young girl and their unborn children.  With that context, Matthews's allegations fall far short of proving actual prejudice.  The state habeas court was not unreasonable in denying Matthews's *Strickland* claims.

## II.    Claims Arising from Trial

Matthews raises three claims involving the trial of his guilt, all of which he also raised on state habeas review.  The court finds that Matthews has not shown that the state-court adjudication of those issues was contrary to, or an unreasonable application of, federal law.

### A.    False Evidence of Presumptive Blood Test (Claim Eight)

In an argument similar to the one concerning the juvenile-waiver hearing, Matthews argues that the State presented false and misleading evidence regarding presumptive blood-test results.  As in juvenile court, the prosecution adduced testimony that DNA testing resulted in preliminarily positive results for various items, such as the clothing which Matthews eventually turned over to the police (in particular a shirt, socks, and blue jeans which he had washed and bleached). R.R. Vol. 10, at 158.  Matthews's briefing gives the impression that the State adduced

47

testimony about only the preliminary positive test results without giving the jury information about additional testing. The State, however, presented the bulk of its DNA testimony through Rachel Burch, a senior forensic analyst at the University of North Texas Center for Human Identification. Burch testified that confirmatory testing of some items revealed that "it's not blood or . . . it was blood but we just can't confirm it." R.R. Vol. 9, at 159-60. Burch also described how the State had not retested some items that had preliminarily tested positive for blood. R.R. Vol. 9, at 160-64. Burch also explained the victim could not "be excluded as the possible major contributor of . . . mixed DNA that's on [Matthews's] right shoe," R.R. Vol. 9, at 165, and "the contributor of [a] female profile on the left shoe." R.R. Vol. 9, at 177. On cross-examination, the defense elicited testimony that confirmatory tests were either negative, inconclusive, or not performed at all. Tr. Vo. 10, at 32-33, 36. Matthews has not pointed to any allegedly false testimony that the defense did not correct through Burch's testimony or cross-examination. *See Long v. Pfister*, 874 F.3d 544, 548 (7th Cir. 2017) ("All *Napue* itself holds is that perjury known to the prosecution must be corrected before the jury retires."). Given the whole of the State's evidence, and placed in the context provide by cross-examination, Matthews has not shown that the state court was unreasonable in finding that he had

> fail[ed] to show that any of the State's evidence complained of in his application supporting memoranda, taken as a whole, was in fact false or otherwise created a false impression either during either the juvenile certification proceeding or subsequent district court trial.

> The Court further concludes that [Matthews] has failed to demonstrate that the introduction of any allegedly false evidence at his trial violated his due-process rights.

State Habeas Record at 214.

## B.   Ineffective Assistance at Trial (Claims Nine and Ten)

Matthews raises two complaints regarding his attorney's representation during the trial of his guilt.  First, Matthews contends that trial counsel should have challenged the admission of testimony and evidence about the presumptive blood tests (claim nine).  Second, Matthews faults counsel for not objecting to testimony about numerous extraneous acts (claim ten).  The state habeas court rejected both claims on state habeas review.  Matthews must show that decision was contrary to, or an unreasonable application of, federal law.  28 U.S.C. § 2254(d)(1).

### 1.   Presumptive Blood Tests

The State used the presumptive blood results at trial much in the same way as it had in the juvenile-court waiver hearing.  Matthews argues that trial counsel should have objected to the admission of the presumptive blood-test results.  The state habeas court found no deficient performance or resultant prejudice in this regard.

In his state habeas affidavit, trial counsel explained: "In fact, it was trial strategy to allow the presumptive tests.  We argued that the lack of confirmatory blood tests was exculpatory."  State Habeas Record at 61.  Trial counsel's closing argument revealed its strategy: Trial counsel argued that the evidence

unquestionably "proves [Matthews] had sex with [the victim], that he was there,"
but that was all it showed. R.R. Vol. 12 at 190. Trial counsel used the presumptive
test results to explain how Matthews initially became "the focus of everyone's
attention." Then counsel went on to argue that attention was unfounded:

> But what they did do was to test to see if they can conclude it was
> what? Human blood. And what did all of those tests—every single one
> of them come back was? It was not human blood. Okay? Now they
> can make all the excuses they want and justifications but what I know
> is the witness sat in the stand, looked you in the eye and I asked the
> question: Did any of them come back as human blood? And her
> response was: We found no human blood on any of these items.

R.R. Vol. 12, at 192, 196. Instead of proving his guilt, trial counsel argued that all
the DNA evidence could prove, when considered objectively, was "that they were
together that day at some point. . . . I think I even asked one of the forensic
scientists, did this evidence show that he committed a murder. No, it doesn't. . . .
It looked good. But it didn't prove a murder. It just proved they were there. It just
proved they had sex." R.R. Vol. 12, at 204.

Trial counsel assessed the information and made an informed, strategic
decision not to object to testimony about the presumptive blood tests. Trial
counsel's strategy allowed jurors to understand why the police arrested Matthews,
but still allowed them to arrive at a not-guilty verdict. Even though trial counsel's
strategy was not successful, *Strickland* jurisprudence gives wide latitude in making
tactical decisions. *See Strickland*, 466 U.S. at 689; *see also Pape v. Thaler*, 645
F.3d 281, 291 (5th Cir. 2011) ("[A] 'conscious and informed decision on trial tactics

and strategy cannot be the basis of constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.'" (quoting *Richards v. Quarterman*, 566 F.3d 553, 564 (5th Cir. 2009))).   The Supreme Court has previously held "[t]o support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." *Harrington v. Richter*, 562 U.S. 86, 109 (2011).   The state habeas court was not unreasonable in finding that trial counsel employed a reasonable trial strategy in his approach to the presumptive positive blood-test results.

### 2.   Bad Acts

Matthews claims that trial counsel provided ineffective representation in failing to object to extraneous bad acts for which the State had allegedly not given requisite notice under Rule 404 of the Texas Rules of Evidence.   Rule 404(b) allows evidence of "other crimes, wrongs or acts" to be admitted for purposes such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," and if "reasonable notice is given in advance of trial of intent to introduce such evidence."   The state habeas court summarized the alleged bad acts presented by the prosecution as follows:

> (A) evidence that [Matthews] sent numerous text messages to the victim discussing ways to cause a miscarriage, procuring an abortion, punching the victim in the stomach, threatening other students and threatening the victim; (B) texting and pursuing other girls while the victim was pregnant with [Matthews's] children; (C) not being affectionate with the victim; (D) paying others to take him to the

victim's home in order to have sex; (E) going to the victim's house without her parents' knowledge; (F) conducting Google searches about getting abortions and causing miscarriages; (G) lying to other girls; (H) talking about killing himself; (I) requesting others to convince the victim to have an abortion; (J) making threats to other students; and (K) [Matthews] yelling at his parents.

State Habeas Record at 192.

In his state habeas affidavit, trial counsel responded to Matthews's complaint that he should have objected to the testimony about "bad acts": "The 'bad acts' . . . were all made known to me. Truthfully, I did not consider them bad acts for the purposes of 404(b). These were not extraneous acts unrelated to the case. These were just facts—none of which were a surprise. It was trial strategy not to make a bunch of frivolous objections but rather stay focused on the defense that someone else did the crime." State Habeas Record at 61.

Matthews has not shown that trial counsel was incorrect in his understanding of Texas evidentiary law. In Texas, "[t]he jury is entitled to know all relevant surrounding facts and circumstances of the charged offense." *Devoe v. State*, 354 S.W.3d 457, 459 (Tex. Crim. App. 2011). Trial counsel admitted that he had received notice of the acts but did not believe that the evidentiary rules barred their admission or use. Rule 404(b) does not apply to "same transaction contextual evidence," that is, to evidence that "imparts to the trier of fact information essential to understanding the context and circumstances of events" that are "blended or interwoven." *See Camacho v. State*, 864 S.W.2d 524, 532 (Tex. Crim. App. 1993).

The contextual evidence "is admissible, not for the purpose of showing character conformity, but to illuminate the nature of the crime alleged." *See id.* Additionally, such extraneous information is admissible as evidence of identity when identity is at issue. *See Moore v. State*, 700 S.W.2d 193, 201 (Tex. Crim. App. 1985). Thus, the alleged "bad acts" provided necessary context to the crime without amounting to separate offenses.

The state habeas court found that Matthews had not shown deficient performance or actual prejudice from trial counsel's handling of the allegedly false evidence. State Habeas Record at 214. Deferring to the trial court's findings, the state habeas court was not unreasonable in its application of *Strickland*. Counsel made a strategic decision not to object based on Texas law. Matthews fails to overcome the strong presumption that counsel's conduct fell within the wide range of reasonable professional assistance. Nor has he shown a reasonable probability that the trial counsel would have sustained any objection based on Rule 404(b). The court denies this claim.

## CERTIFICATE OF APPEALABILITY

Rule 11 of the Rules Governing Section 2254 Cases requires a district court to issue or deny a certificate of appealability when entering a final order that is adverse to the petitioner. A certificate of appealability will not issue unless the petitioner makes "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), which requires a petitioner to demonstrate "'that reasonable

jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).  After careful review of the petitioner's claims and the applicable law, the court concludes that reasonable jurists would not find its ruling debatable or wrong.  The court will not certify any issue for appellate consideration.

## CONCLUSION AND ORDER

The court orders as follows:

1.  The motion for summary judgment (Dkt. 15) is granted.

2.  The federal habeas corpus petition (Dkt. 1) is denied.

3.  No certificate of appealability will issue.

The clerk will provide a copy of this order to the parties of record.

SIGNED on Galveston Island on _____October 26th_____, 2020.

_____
JEFFREY VINCENT BROWN
UNITED STATES DISTRICT JUDGE